UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                          :

UNITED STATES OF AMERICA          :

     v.                        :

IVARS OZOLS,           :  Case No. 16 Cr. 692 (JMF)
                          :

     Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM
## OF DEFENDANT IVARS OZOLS

Darren A. LaVerne
Nolan J. Robinson
Samuel B. Shepson

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
Telephone:  212.715.9100

*Counsel for Ivars Ozols*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

    I.     Mr. Ozols' Character And Personal History ................................................. 3

         A.     Early Life, Education, And Employment ................................... 3

         B.     Mr. Ozols' Financial Struggles .................................................. 4

         C.     Mr. Ozols' Relationship With His Sons ..................................... 7

         D.     Mr. Ozols' Relationship With Ms. Shaw................................... 8

         E.     Mr. Ozols' Powerlifting Career ................................................. 9

    II.    The Offense Conduct ................................................................................. 10

    III.   Plea Agreement ......................................................................................... 11

ARGUMENT ......................................................................................................................... 12

    I.     Legal Standard .......................................................................................... 12

    II.    A Sentence Below 36 Months' Imprisonment Would Be Sufficient To Achieve The Purposes Of 18 U.S.C. § 3553(a) .................................................. 13

         A.     The Court Should Use the Stipulated Guidelines Range In The Plea Agreement ................................................................. 13

         B.     The Circumstances That Led Mr. Ozols To Commit The Offense Warrant Imposition Of A Below-Guidelines Sentence ........................... 14

         C.     The Impact Of A Long Sentence On Mr. Ozols' Family ......................... 16

         D.     Mr. Ozols Poses No Risk Of Recidivism Or Danger To The Public........ 17

         E.     Mr. Ozols Should Receive A Sentence At The Low End Of Spectrum Of Sentences Imposed In This Case ......................................... 18

    CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Gall v. United States*,
　552 U.S. 38 (2007)...................................................................................12, 13, 18

*Rita v. United States*,
　551 U.S. 338 (2007).........................................................................................12

*United States v. Aleksandrs Mukans*,
　16. Cr. 692 (S.D.N.Y. Jan. 29, 2018).................................................................18

*United States v. Aleksejev*,
　No. 11 Cr. 878 (LAK) (S.D.N.Y. Oct.10, 2013) ...............................................14

*United States v. Booker*,
　543 U.S. 220 (2005).........................................................................................12

*United States v. Carmona-Rodriguez*,
　No. 04 CR 667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ...................17

*United States v. Hernandez*,
　No. 03-cr-1257 (RWS), 2005 WL 1242344 (S.D.N.Y. May 24, 2005) ................17

*United States v. Hodges*,
　No. 07-CR-706 (CPS), 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009).................17

*United States v. Johnson*,
　567 F.3d 40 (2d Cir. 2009)...............................................................................12

**Federal Statutes**

18 U.S.C. § 981(a)(1)(C) ........................................................................................11

18 U.S.C. § 1349......................................................................................................11

18 U.S.C. § 3553(a) ...........................................................................................12, 13, 17

18 U.S.C. § 3553(a)(1).............................................................................................12

18 U.S.C. § 3553(a)(2)(A) – (C)...............................................................................12

18 U.S.C. §§ 3553(a)(2)(B)&(C)...............................................................................17

18 U.S.C. § 3553(a)(6).............................................................................................18

28 U.S.C. § 2461(c) ............................................................................................................11

**Rules**

Fed. R. Crim. P. 49.1(a)(3) .................................................................................................5

Rule 16..................................................................................................................................13

## TABLE OF EXHIBITS

Exhibit

**Title**

Letter of Ivars Ozols ............................................................................................................A

Letter of Zigurds Ozols ........................................................................................................B

Letter of Imants Brahmanis ..................................................................................................C

Letter from Stora Enso..........................................................................................................D

Letter of Raisa Ozols ............................................................................................................E

Letter of Horens Ozols ..........................................................................................................F

Brønnøysund Register Centre, New Registration ................................................................G

Brønnøysund Register Centre, Change of Business Enterprise Name ................................H

Photographs of Mr. Ozols and Family ..................................................................................I

Letter of Jeneve Shaw ...........................................................................................................J

Letter of Donnet Maria .........................................................................................................K

Summary of Competition Results.........................................................................................L

MDC Work Performance Rating ..........................................................................................M

*United States v. Aleksejev*, No. 11 Cr. 878 (LAK) (S.D.N.Y. Oct. 10, 2013),
    Sentencing Hearing Transcript .......................................................................................N

*United States v. Lawrence Obracanik*, 17 Cr. 144 (RA) (S.D.N.Y. July 20, 2017),
    Government Sentencing Submission ...............................................................................O

*United States v. Lawrence Obracanik*, 17 Cr. 144 (RA) (S.D.N.Y. Aug. 22, 2017),
    Sentencing Hearing Transcript ....................................................................................... P

*United States v. Aleksandrs Mukans*, 16. Cr. 692 (JMF) (S.D.N.Y. Jan. 29, 2018),
    Defendant Sentencing Submission ..................................................................................Q

*United States v. Aleksandrs Mukans*, 16 Cr. 692 (JMF) (S.D.N.Y. Mar. 13, 2018),
    Sentencing Hearing Transcript .......................................................................................R

*United States v. Emils Mors*, 16 Cr. 692 (JMF) (S.D.N.Y. Aug. 8, 2017),
    Sentencing Hearing Transcript ....................................................................................... S

*United States v. Janis Klava*, 16 Cr. 692 (JMF) (S.D.N.Y. Jan. 23, 2018),
Government Sentencing Submission ........................................................................ T

*United States v. Kristaps Beresnevics*, 16 Cr. 692 (JMF) (S.D.N.Y. Jan. 9, 2018),
Sentencing Hearing Transcript ............................................................................... U

*United States v. Emils Mors*, 16 Cr. 692 (JMF) (S.D.N.Y. July 14, 2017),
Government Sentencing Submission ........................................................................ V

On behalf of our client Ivars Ozols, we respectfully submit this memorandum to assist the Court at sentencing, scheduled for February 5, 2019.

## PRELIMINARY STATEMENT

Ivars Ozols is a 40-year-old father of two, with a substantial work history – including seven years as a factory production operator and nearly a decade as a small-business owner in Latvia and Norway – that demonstrates he is not inclined to take the easy way out.  As is evident from his own letter to the Court, he is embarrassed by and deeply regrets his participation in this fraud scheme, and accepts responsibility for his actions.  *See* Exh. A (Letter of Ivars Ozols).  As he awaits sentencing, foremost in Mr. Ozols' mind is serving his sentence, returning to his two sons, and rebuilding the life he left nearly two years ago, thousands of miles away in his native land.

While nothing excuses Mr. Ozols' participation in this offense, there is context, and that context is critical in fashioning just punishment here.  Beginning in 2008 and then again in 2017, Mr. Ozols struggled through a series of business setbacks, which left him with hundreds of thousands of dollars in debt.  His circumstances were made even more difficult as he was financially supporting his son, Horens, whose mother abandoned him following her divorce from Mr. Ozols in 2004.  The banks forced Mr. Ozols to liquidate his home and business assets.  But the most consequential debt he owed was to other creditors in Latvia who had also loaned money to Mr. Ozols so that he could build and expand a delivery business he had started in 2007.  Those men pressured Mr. Ozols to pay them, and when he failed to do so, assaulted him.  In 2017, they offered Mr. Ozols a way to work off the debt:  travel to the United States and work for their business, which, they explained, involved selling cars.  Mr. Ozols agreed to do so without knowing that he was joining a criminal scheme.  After traveling here and learning more about

their "business," he came to understand that they were in fact paying him to transfer criminal proceeds back to them in Latvia.

At that point, Mr. Ozols could have refused to continue working for the men and returned to Latvia. He could have reported them to the police. He did neither of those things, choosing instead to continue participating in the fraud and earning money to pay down his debts. It was the wrong decision and a fateful decision, but not one that was consistent with who Mr. Ozols is, or how he can be expected to live his life going forward. Mr. Ozols, who was a low-level participant in this scheme, is not a fraudster. As is evidenced by his work record and the letters submitted on his behalf, he is a hard-working man, a good son and caring father to his own children, and someone who will return to society as a productive and responsible person. More time in prison will not make that any more likely, and may well have the opposite effect.

The Court has previously sentenced four defendants in this case. We understand that Mr. Ozols thus comes before the Court with the parameters of punishment partially staked out. The question is where does he fit within these parameters, given his personal history and the nature of his involvement with the offense. For the reasons set forth below, we respectfully submit that the Court should sentence Mr. Ozols at the low end of the spectrum of sentences it has handed down, and that he should receive a sentence below the 36 months' imprisonment that the Court imposed on defendant Aleksandrs Mukans.[1]

---

[1] The Court has imposed terms of imprisonment ranging from 36 months to 66 months. Aleksandrs Mukans (whom the government characterized as a "seasoned participant," yet who, like Mr. Ozols, had no supervisory role in the scheme) received a below-Guidelines sentence of 36 months' imprisonment. Janis Klava and Kristaps Beresnevics (the former a manager "at the higher end of the conspirators within the United States," and the latter who "played a critical supervisory role" in the scheme) each received a sentence of 66 months' imprisonment. A fourth defendant, Emils Mors, was a "mid-level manager" who jumped bail and re-joined the conspiracy following his initial arrest; Mr. Mors was sentenced to 57 months' imprisonment, at the bottom of the applicable Guidelines range.

## BACKGROUND

### I.       Mr. Ozols' Character And Personal History

Born into a working class family in the former Soviet Union, throughout his life Mr. Ozols has sought to improve himself and provide for his family through hard work.  While doing so, he built a career as a champion power lifter, training before and after work.  Mr. Ozols has also devoted himself to being a loving and involved father to his two children, now ages 9 and 18.

#### A.       Early Life, Education, And Employment

Mr. Ozols grew up in Jelgava, Latvia.  *See* Presentence Investigation Report dated January 11, 2019 ("PSR") at ¶73.  For the first thirteen years of his life, Latvia was a part of the Soviet Union and Mr. Ozols' family lived a working-class existence that was stable but without the consumer goods and material comforts that we associate with life in the United States.  Mr. Ozols and his older brother lived with their father, Zigurds, who worked for a printing company, and his mother, Raisa, who worked in meat production.  *See* PSR at ¶¶74-75.

Following in his mother's footsteps, when Mr. Ozols completed the equivalent of ninth grade, he entered a vocational program to train for a career in meat processing and production.  *See* PSR at ¶89.  After completion of that program in 1997, Mr. Ozols began his military service in a military police division of the Latvian Army, electing to join voluntarily before he was called into service.  *See* PSR at ¶94; Exh. B (Letter of Zigurds Ozols).  Mr. Ozols would achieve the rank of sergeant and receive an award for courage, as well as forge life-long friendships with his fellow soldiers.  *See* Exh. B (Letter of Zigurds Ozols); Exh. C (Letter of Imants Brahmanis).

Upon the successful completion of his military service in 1998, Mr. Ozols began working as a security guard for a company called Lexu Security, where he provided security services for businesses in the Jelgava region in Latvia.  *See* PSR at ¶105.  In 2000, Mr. Ozols obtained a position as a production operator with the Stora Enso corporation.  *See* Exh. D (Letter from Stora Enso); *see also* PSR at ¶103.  Stora Enzo is a publicly traded manufacturer of pulp, paper and other forest products, headquartered in Helsinki, Finland, with over ten billion euros in annual revenue.[2]  Mr. Ozols worked in a Stora Enso factory in Riga, Latvia, manufacturing cardboard boxes and other packaging materials.  Over time, Mr. Ozols took on supervisory responsibilities, overseeing production processes and enforcing quality controls.  *See* Exh. B (Letter of Zigurds Ozols).

In April 2000, Mr. Ozols married Liga Dusa Gapijenko, whom Mr. Ozols had known since he was a teenager.  Later that year, Ms. Gapijenko gave birth to Mr. Ozols first son, Horens Ozols, on October 17, 2000.  Unfortunately, Mr. Ozols and Ms. Gapijenko would separate in 2003 and divorce in 2004.  *See* PSR at ¶76.  Ms. Gapijenko moved abroad, leaving Horens, from that time forward, in the care of Mr. Ozols.  The following year, Mr. Ozols began dating Inga Kupste, a colleague from Stora Enso, who thereafter moved in with Mr. Ozols and Horens.  *See* PSR at ¶77.

### B.    Mr. Ozols' Financial Struggles

In 2007, Mr. Ozols decided to strike out on his own, leaving his position at Stora Enso and starting his own business, Oz Sport, delivering food and bottled water.[3]  *See* PSR at

---

[2] ABOUT STORA ENSO, https://www.storaenso.com/en/about-stora-enso (last visited Jan. 18, 2019).

[3] While the PSR refers to the business as "Ozols Sport," Mr. Ozols advises that it was in fact known as "Oz Sport."

¶101.  To get the business up and running, Mr. Ozols mortgaged his home and vehicles,

borrowing the equivalent in euros of approximately $500,000.  *See* PSR at ¶¶50, 110.  Mr.

Ozols' parents also agreed to mortgage their home, so as to help him start the business.  *See* Exh.

B (Letter of Zigurds Ozols) ("a big credit was taken from the bank . . . a lot of transport units

have been pledged [to secure the loan], his house and my apartment where I lived as well.").  Oz

Sport enjoyed early success obtaining delivery contracts, and before long the company was in

need of additional vans and drivers to meet the company's obligations.  Mr. Ozols approached a

commercial bank in Riga to increase his credit line, but without additional collateral to secure the

loan, the bank was unwilling to extend additional credit to Mr. Ozols.  As a result, Mr. Ozols

turned to private creditors, who agreed to lend Mr. Ozols €30,000 to finance the purchase of

additional vehicles and the hiring of additional drivers.  *See* PSR at ¶¶50, 110.

Immediately following the expansion, Oz Sport did well.  Mr. Ozols earned

approximately €4,000 per month in profit, allowing him to make regular debt payments and care

for his son.  But in 2008, the global financial crisis hit Latvia particularly hard.  In 2008-2009,

the Latvian economy shrunk by 25% and unemployment surpassed 20%.[4]  The country's

economic turmoil was devastating to Mr. Ozols' business, and he was forced to shut down Oz

Sport, liquidate his business assets, and eventually sell his home, turning the proceeds over to the

bank but nonetheless covering only a small percentage of Mr. Ozols' existing debt.

In 2009, Mr. Ozols had a second son, N.O., born to his girlfriend Inga Kupste.[5]

*See* PSR at ¶77.  Notwithstanding his financial difficulties, Mr. Ozols was determined to provide

---

[4] International Labour Office, Labour Market Measures in Latvia 2008-13: The Crisis and Beyond, 2015, https://www.ilo.org/wcmsp5/groups/public/---dgreports/---inst/documents/publication/wcms_449930.pdf.

[5] Pursuant to Fed. R. Crim. P. 49.1(a)(3), we use initials to refer to Mr. Ozols' youngest son.

for his growing family.  With dismal employment prospects and a crushing debt burden, at the end of 2009 Mr. Ozols decided to leave his sons and girlfriend in Latvia for Norway, where he hoped that the more prosperous economy there would allow him to return to financial security. *See* Exh. E (Letter of Raisa Ozols) ("The crisis of 2008/2009 made Ivars change jobs and places of living, as back then in Latvia there was no work or money.  Ivars emigrated to Norway, hoping to find a job to support family, and pay off the debts he had owed for his business before the crisis.").  As recalled by his son Horens:

> In 2009 [my father] moved to Norway to support the family, the reason why he moved was that he took a loan on our house at the time and my grandparents apartment, not long after that Latvia hit an financial crisis. While being there he would send most of his money to us to pay off the debt, send clothes for me and my brother and we would always talk on skype every night.

*See* Exh. F (Letter of Horens Ozols).

Upon arriving in Stavanger, Norway, Mr. Ozols began working for a company called Lye Transport, delivering furniture and other items for Ikea.  *See* PSR at ¶99.  Within a year, Mr. Ozols began to build another small business delivering fish, meat, bread, and other foods.  Mr. Ozols incorporated the new delivery business in September of 2010 that would he would later call EIK Transport ("Eik" is Norwegian for "Oak," and "Ozols" translated to "Oak" in Latvian).  *See* Exh. G (Brønnøysund Register Centre, New Registration) and Exh. H (Brønnøysund Register Centre, Change of Business Enterprise Name); *see also* PSR at ¶97.  EIK Transport performed well, and shortly after it began operations Mr. Ozols was generating profits. Mr. Ozols expanded his company, building the business up to four employees with five vans and increasing the company's profitability.  By August of 2011, Mr. Ozols' business was turning a profit sufficient to make payments on his debts, and more importantly, earning enough money to

bring Ms. Kupste and his sons to live with him in Norway.  Mr. Ozols even began supporting a girl in Vietnam through a charity, sending her approximately $35 each month.

        For a few years Mr. Ozols and his family thrived in Norway.  Mr. Ozols and Ms. Kupste were both working and saving money.  Horens, and eventually N.O., began school.  Mr. Ozols spent much of his free time with his sons, frequently taking them on hikes in the Norwegian countryside, as they had done together in Latvia years before.  *See* Exh. I, pp. 2, 6 (Photographs of Mr. Ozols and Family).  But by 2016, problems arose once again, both personally and professionally.  Mr. Ozols' relationship with Ms. Kupste, who travelled frequently to Latvia, came to an end, when she left him for someone else.  Ms. Kupste took Mr. Ozols' younger son N.O. with her back to Latvia.  Horens was sometimes left to fend for himself as Mr. Ozols' worked to keep his business, which had begun to struggle, afloat.  The severe drop in oil prices that had begun in 2014 took a toll on the Norwegian economy,[6] cutting demand for the delivery services provided by Mr. Ozols' business. Unable to meet his expenses, Mr. Ozols closed EIK Transport in 2017 and returned to Latvia while Horens remained in Norway to complete his high school education.  *See* PSR at ¶¶76, 97.

    **C.**    **Mr. Ozols' Relationship With His Sons**

        As is evident from Horens' letter to the Court, Mr. Ozols and Horens have a special bond, made stronger by the fact that Horens, as a young child, was abandoned by his biological mother and then abandoned again by Ms. Kupste, who had effectively been his stepmother.  Horens describes Mr. Ozols as his "best friend," and "the person I could always talk to about anything or if I had a problem he would help or try to solve it no matter what it took."

---

[6] Crude oil prices dropped seventy percent between 2014 and 2016, causing significant economic problems for Norway, Europe's top oil and gas producer.  Gwladys Fouche and Terje Solsvik, "Norway's economy loses its shine," *Reuters*, Feb. 16, 2016, https://uk.reuters.com/article/uk-norway-economy-idUKKCN0VP1LZ.

*See* Exh. F (Letter of Horens Ozols).  Horens is presently in school, and without Mr. Ozols, he

has no parental figure in his life and no financial support, other than the minimal support

provided by the Norwegian government.[7]  As Horens writes:

> It's been hard both mentally and money wise for me since I have
> no one other to help me, my grandparents can't help me since they
> are paying with what they got to keep their apartment. I haven't
> been in contact with my biological mother since I was 6 or 7. He's
> been a good father to me and taught me a lot of stuff and if he will
> serve a long sentence it will impact me a lot. As of now he missed
> my 18th birthday while he has been in jail. And I really don't want
> him to miss my little brothers birthdays either. And my
> grandparents were depending on him to pay down the loan so the
> bank wouldn't take their apartment from them as of [sic] they have
> no place to go.

*See* Exh. F (Letter of Horens Ozols).  Since Ms. Kupste left Mr. Ozols in 2016, Mr. Ozols'

relationship with his younger son N.O. has become more difficult.  As Mr. Ozols writes:  "In my

absence, [N.O.] has expressed sadness about me being 'gone.'  In my communications with him,

they have been strained, because all of his other friends and teammates have their fathers around.

I have a lot to make up to him."  *See* Exh. A (Letter of Ivars Ozols).  Above all else, Mr. Ozols

looks forward to reconnecting and rebuilding his relationship with both of his sons when he

returns home.

### D.     Mr. Ozols' Relationship With Ms. Shaw

As is discussed further below, following the failure of EIK Transport and in an

effort to pay off his debts, in June 2017 Mr. Ozols agreed to travel to the United States at the

behest of the creditors to whom he had become indebted.  Mr. Ozols lived in Florida for less than

a year before he was arrested, in April 2018, but during that time he met and formed an abiding

relationship with Jeneve Shaw.  Ms. Shaw, who was living in Florida at the time, resides in

---

[7] Horens advises that he receives approximately 10,000 Norwegian Kroner (approximately
$1,150) from the Norwegian government per month for rent, food, and other living expenses.

Canada and Jamaica, where she owns and operates an event planning business.  Since his

imprisonment, Ms. Shaw has been regularly in touch with counsel, concerned for Mr. Ozols' fate

and anxious to share with us her own observations of Mr. Ozols' character and commitment to

his own and her families.  As she writes in her letter, Ms. Shaw has four children from a prior

marriage, now grown, whom Mr. Ozols has come to know and care for.  Ms. Shaw explains,

"He's an amazing father not only to his kids but to mine too . . . Ivars is always there for our

kids, giving them advice.  My kids know there's no one that will ever replace their father but

they tell me they love him just like a father."  *See* Exh. J (Letter of Jeneve Shaw).  Ms. Shaw's

sister, Donnet Maria, has also submitted a letter corroborating the positive impact Mr. Ozols has

had on the lives of Ms. Shaw and her children.  *See* Exh. K (Letter of Donnet Maria).

> **E.**     **Mr. Ozols' Powerlifting Career**

While working and raising a family, Mr. Ozols also spent years training as a top-

flight power lifter, going on to win international and European competitions.  Mr. Ozols began

training at age 13 and was competing by age 22.  At age 25, Mr. Ozols competed in the Latvian

power lifting national championship.  By the time he was 27, in 2005, Mr. Ozols began

competing at a Europe-wide level, placing second in the European bench press championship in

Croatia.  For the next six years, Mr. Ozols participated in nearly a dozen European and

worldwide competitions, placing first in the European power lifting championship in 2011.  *See*

Exh. L (Summary of Competition Results); *see also* PSR at ¶91.  Performance at this elite level

required intensive training – Mr. Ozols trained approximately four hours after work at the gym

every day during this period of his life.  While the sport was not lucrative and provided little in

the way of supplementary income, Mr. Ozols has over the years been able to use his training and

experience to do side work as a personal trainer.  Indeed, from 2005 to 2008, Mr. Ozols studied

to become a coach at a sports academy in Riga, Latvia, and hopes to build a career coaching and training others after serving his sentence.[8]  *See* PSR at ¶88; *see also* Exh. C, (Letter of Imants Brahmanis) ("I know that Ivars' goal is to open his own gym.  I'm sure he will and will improve [the] physical and mental condition of many people.").

## II.    The Offense Conduct

Mr. Ozols accepts full responsibility for his offense and makes no excuses for his participation in this fraud scheme.  As he acknowledges in his letter, "There are no excuses to break the law.  I am completely at fault."  *See* Exh. A (Letter of Ivars Ozols).  We respectfully submit, however, that there is important context for Mr. Ozols' actions that the Court should consider in fashioning the appropriate sentence.

As noted, by 2017, Mr. Ozols was in dire financial straits.  He had not been able to retire his bank debt and had taken on a substantial loan from other creditors in order to expand his business.  Although he had succeeded in paying back approximately ten thousand of the thirty thousand euros he had borrowed, the creditors made clear that Mr. Ozols was taking too long to pay back what remained of the balance.  Over time, the creditors exerted increasing pressure on Mr. Ozols to repay the debt, and on one occasion physically assaulted Mr. Ozols while he was at the gym.  These men also began to threaten Mr. Ozols' parents at their home. *See* Exh. E (Letter of Raisa Ozols) ("Because of these debts, some criminals used to come and

---

[8]  While incarcerated at MDC, Mr. Ozols has been very involved in training other inmates, and has been advised by MDC staff that he will be awarded a teaching certificate later this month for his efforts in physical education.  We will forward the certificate to the Court should we receive it prior to sentencing.  This is in addition to the work Mr. Ozols has done at MDC as an orderly, cleaning showers.  With regard to that work, Mr. Ozols' supervisor has written that Mr. Ozols "has done a wonderful job," "works well with his peers," and is "very dependable, very helpful to other inmates in need."  *See* Exh. K (MDC Work Performance Rating); *see also* PSR at ¶93.

threaten us").  After his business in Norway failed and he returned to Latvia, the pressure on Mr.

Ozols grew.

In early 2017, the creditors proposed that Mr. Ozols pay off his debt by traveling

to the United States to work for a car sales business with which they were involved.  Under the

circumstances, Mr. Ozols agreed to do so.  He was not aware at the time that the business was in

fact a criminal operation, and did not begin to understand that it was until after he moved to the

United States.  Following his arrival in Florida in June 2017, Mr. Ozols was provided with

instructions regarding the bank accounts which he was to open.  He periodically received text

messages from the orchestrators of the scheme directing him to withdraw money from certain

accounts, and then to either wire it back to them in Latvia, or provide it to another member of the

conspiracy in the United States.  Mr. Ozols was permitted to keep 10% of the funds that he

withdrew.  He made a series of withdrawals in June and July 2017, and then again during the

period September through December of 2017.

Mr. Ozols was arrested in April 2018.  Upon arrest, he agreed to be interviewed at

length by the FBI.  Mr. Ozols immediately admitted his involvement in the offense.

## III.    Plea Agreement

On October 22, 2018, Mr. Ozols pleaded guilty, pursuant to a plea agreement, to

Count One of the Superseding Indictment charging him with conspiracy to commit bank and

wire fraud (18 U.S.C. § 1349).  Mr. Ozols also admitted to the forfeiture allegation with respect

to Count One of the Superseding Indictment and agreed to forfeit to the United States

$234,522.00, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  In the plea

agreement, the parties stipulated to an advisory Guidelines offense level of 22 and a criminal

history category of I, yielding a range of 41 months to 51 months' imprisonment.  The parties

stipulated that the loss amount applicable to Mr. Ozols was greater than $250,000 but less than $550,000.

As part of the agreement, Mr. Ozols reserved that right to seek a sentence below the stipulated range based on the factors set forth in 18 U.S.C. § 3553(a).

## ARGUMENT

### I.      Legal Standard

In *United States v. Booker*, the Supreme Court rendered advisory the once-binding Sentencing Guidelines and empowered district courts to take full account of the sentencing factors provided in 18 U.S.C. § 3553(a)(1). *See United States v. Booker*, 543 U.S. 220, 259 (2005). While the sentencing court should use the Guidelines as its "starting point and the initial benchmark," it must also consider all of the § 3553(a) factors to determine whether they support the imposition of the Guidelines sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). Section 3553(a) instructs sentencing courts to take a holistic approach to sentencing, requiring the Court to consider "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The statute's overarching requirement is that the Court "impose a sentence sufficient but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," to "provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A) – (C). The Court must make "an individualized assessment" of all of the facts and circumstances. *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009) (internal quotation marks omitted).

In weighing the § 3553(a) factors, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551

U.S. 338, 351 (2007) (citing *Booker*, 543 U.S. at 259-60).  The Court need not find

"'extraordinary' circumstances" to justify a sentence outside of the Guidelines range.  *Gall*, *522*

U.S. at 47.  Instead, the sentencing court "must make an individualized assessment based on the

facts presented."  *Id.* at 50.

## II.     A Sentence Below 36 Months' Imprisonment Would Be Sufficient To Achieve The Purposes Of 18 U.S.C. § 3553(a)

### A.     The Court Should Use the Stipulated Guidelines Range In The Plea Agreement

As, noted, in the plea agreement the parties stipulated to a loss amount of more

than $250,000 but no greater than $550,000, which, together with the other stipulated

adjustments and applicable Criminal History Category of I, results in an advisory Guidelines

range of 41 to 51 months' imprisonment.  Notwithstanding this stipulation, the PSR calculates a

loss amount of more than $550,000 but no greater than $1.5 million, which yields a range of 51

to 63 months' imprisonment.  *See* PSR at ¶5.  The Probation Department's loss calculation is

based on information that was not provided as part of Rule 16 discovery and was not available to

the defense at the time Mr. Ozols pleaded guilty.  Indeed, this information was not provided to

the defense until last week, following our request for it after the first draft of the PSR was issued

on December 14, 2018.[9]

Whether or not the Court chooses to apply the stipulated range,[10] we respectfully

submit that loss is a poor measure of culpability here.  Mr. Ozols was a low-level participant in

---

[9]  We understand from the government that it was not in possession of this information at the time of the plea.

[10]  While we recognize that the Court is not bound by the parties' stipulation, we respectfully submit that the Court should exercise its discretion and apply the stipulated range.  The government entered into the stipulation aware that its investigation was ongoing and that it might uncover evidence of additional funds withdrawn from bank accounts by Mr. Ozols.  It

this fraud, who withdrew and transmitted funds at the direction of others.  The amount of money

he withdrew was not a function of his own calculation or planning.  Rather, the loss amount here

is a function of which of the numerous low-level conspirators, like Mr. Ozols, the orchestrators

of the scheme chose to use to withdraw funds and how frequently they asked them to do it.

Accordingly, the amount of funds withdrawn is not a reliable basis on which to fashion a

sentence or adjudge culpability as between the lower–level participants in this scheme.[11] *See*

Exh. N at Tr. 11:12-21 (Sentencing Hearing Transcript, *United States v. Aleksejev*, No. 11 Cr.

878 (LAK) (S.D.N.Y. Oct.10, 2013)) (granting a downward variance, in part, because "[t]he

application of the increases in offense levels dictated, for guidelines purposes, by the loss table in

financial crime cases sometimes are effectively quite arbitrary and have very little or only

modest relationship to the level of culpability of a particular defendant, and this is such a case").

**B.     The Circumstances That Led Mr. Ozols To Commit The Offense Warrant Imposition Of A Below-Guidelines Sentence**

As noted, Mr. Ozols became involved and remained in this conspiracy to repay a

debt to creditors who had become increasingly threatening and, in fact, assaulted him.  That debt,

in addition to the hundreds of thousands of dollars of bank debt that Mr. Ozols had previously

incurred, weighed heavily on Mr. Ozols and his family.  While by no means a legal defense to, or

---

nonetheless believed that a Guidelines range 41 to 51 months was the appropriate sentencing range in Mr. Ozols' case, and offered a guilty plea on that basis.

[11]  By our calculations, even including the information recently provided to Probation, the total amount of money withdrawn from accounts from which the government contends Mr. Ozols withdrew finds was $567,969, which is just over the $550,000 loss threshold.  While the bank statements reflect additional deposits into these accounts (totaling $604,156), we are not aware of any evidence that Mr. Ozols was aware of these deposits or had any role in obtaining them from the scheme's victims.

excuse for, this crime, we respectfully submit that this fact should mitigate the sentence that the Court would otherwise impose.

In August 2017, Judge Abrams sentenced a defendant in a fraud case where the defendant's motive for committing the crime – to repay a debt – factored significantly in the Court's determination of the appropriate sentence.  Defendant Lawrence Obracanik pleaded guilty to perpetrating what the government described as a "massive fraud," in which the defendant, a bank employee, stole $4.7 million dollars by directing that money be wired from an account at the bank, through another company, into an account controlled by the defendant.  *See* Exh. O at Gov. 4 (Government Sentencing Submission, *United States v. Lawrence Obracanik*, No. 17 Cr. 144 (RA) (S.D.N.Y. July 20, 2017)).  The applicable Guidelines range was 51 to 63 months' imprisonment.  There was no dispute at sentencing that the defendant stole the money and that he had done so for his own benefit.  However, the defendant argued that he had committed the offense to pay off debts incurred as a result of his gambling addiction, including a $300,000 debt owed to his "bookie," who was threating him.  *See* Exh. P at Tr. 7:10-13 (Sentencing Hearing Transcript, *United States v. Lawrence Obracanik*, No. 17 Cr. 144 (RA) (S.D.N.Y. Aug. 22, 2017)).  The defendant also had close family ties, including to his two young children, and had expressed deep remorse for his crime.  *Id.* at 7:22-24, 11:3-5, 13:17-20.  In light of these mitigating factors, the Court imposed a non-Guidelines sentence of one year and one day.  *Id.* at 17:19-22.

We respectfully submit that Mr. Ozols' case presents an even more compelling case for a non-Guidelines sentence than did Obracanik's.  Obracanik was not a low-level participant; rather he was the sole perpetrator of the fraud and reaped the full benefit of the stolen funds.  The amount stolen in Obracanik's case, close to $5 million, was far more than the loss

amount applicable to Mr. Ozols.  And while Mr. Ozols entered into the fraud scheme in an effort to repay crushing debt accumulated as part of his lawful efforts to build a business and support his family, Obracanik stole money to repay gambling debts.

### C.    The Impact Of A Long Sentence On Mr. Ozols' Family

In determining just punishment in this case, the Court should also consider the impact a long period of incarceration will have on Mr. Ozols' family, including his children. Horens has been able to survive financially this past year without Mr. Ozols, but only because he is receiving government assistance in Norway.  Just as important, Horens has no relationship with his mother, and Mr. Ozols is the sole parent available to provide the emotional and familial support that Horens, on the threshold of adulthood, needs.  Mr. Ozols' other son, N.O., at nine years old, is even more impressionable, and an extended prison sentence will further damage their relationship, which has already suffered as a result of Mr. Ozols' poor judgment in becoming involved in this offense.  *See* Exh. B (Letter of Zigurds Ozols) ("[Mr. Ozols] help is needed also for both sons . . . who are living without a father.").  We ask the Court to consider that visiting Mr. Ozols in prison will not be an option for his children; unlike most other defendants, Mr. Ozols' family is thousands of miles away, without the funds or ability to visit him regularly while he is incarcerated.

An extended period of incarceration will also have a substantial impact on Mr. Ozols' elderly parents, who are struggling to hold on to the home they mortgaged to help Mr. Ozols start his business, and are counting on his financial assistance when he returns.  *See* Exh. E (Letter of Raisa Ozols) ("We both with Ivars' father are paying off his debts to the banks and private persons, and we hope he would be able to support us financially in the near future.").  In

his letter, Mr. Ozols' father summarizes the family's predicament and the significance of Mr.

Ozols' return to his family:

> When Ivars started his transportation logistics business, a big credit
> was taken from the bank, a lot of transport units have been
> pledged, his house and my apartment where I lived as well.
> Everything was lost except my apartment, the bank has seized it.  I
> cannot pay my loan with my poor salary.  If Ivars were free, he
> could help us with the bank's problems, as we have a risk of
> becoming homeless with Ivars' mother, his help is needed also for
> both sons in Norway who are living without a father.

*See* Exh. B (Letter of Zigurds Ozols).

### D.    Mr. Ozols Poses No Risk Of Recidivism Or Danger To The Public

The sentencing statute provides that the sentence imposed should "afford

adequate deterrence to criminal conduct" and "protect the public from further crimes of the

defendant."  18 U.S.C. §§ 3553(a)(2)(B)&(C).  We respectfully submit that Mr. Ozols presents

little or no risk of recidivism, and there is no need to impose a lengthy term of imprisonment to

protect the public from future crimes by the defendant.  Mr. Ozols does not fit the profile of the

typical offender – he is older,[12] has a long history of regular employment, is a devoted parent,

and came to this offense as the result of the failure of his business and mounting debt.  A more

reliable indicator of Mr. Ozols' likely conduct following his sentence in this case is his

---

[12]   In considering the § 3553(a) factors, courts have imposed below-Guidelines sentences on
defendants who are "over the age of forty, on the grounds that such defendants exhibit markedly
lower rates of recidivism in comparison to younger defendants."  *United States v. Hernandez*,
No. 03-cr-1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005); *see also United
States v. Hodges*, No.  07-CR-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009)
(noting the "inverse relationship between age and recidivism" and "tak[ing] into account the
defendant's age in fashioning his sentence"); *United States v. Carmona-Rodriguez*, No. 04 CR
667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citing the defendant's age and
low probability of recidivism as grounds for imposing a below-Guidelines sentence).

substantial work history – which he has continued through his time at the MDC – and his devotion to his family.

      **E.**     **Mr. Ozols Should Receive A Sentence At The Low End Of Spectrum Of Sentences Imposed In This Case**

      In determining the appropriate sentence, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Conversely, the Court should also consider avoiding "unwarranted *similarities* among other co-conspirators who were not similarly situated." *See Gall*, 552 U.S. at 55.

      Of the defendants previously sentenced in this case, we submit that Mr. Ozols is most similarly situated to Aleksandrs Mukans, who received a below-Guidelines sentence of 36 months' imprisonment. Based on a loss calculation of more than $250,000 but less than $550,000, *see* Exh. Q at Def. 11 (Defendant Sentencing Submission, *United States v. Aleksandrs Mukans*, 16. Cr. 692 (JFM) (S.D.N.Y. Jan. 29, 2018)), Mr. Mukans' Guidelines range was 41-51 months, the same range stipulated to by Mr. Ozols and the government in Mr. Ozols' plea agreement. *See* Exh. R at Tr. 5:23-25 (Sentencing Hearing Transcript, *United States v. Aleksandrs Mukans*, 16 Cr. 692 (JFM) (S.D.N.Y. Mar. 13, 2018)). Like Mr. Mukans, and unlike the other defendants sentenced to date (who are in their twenties), Mr. Ozols is at an age where he is unlikely to recidivate.[13] *See* PSR at ¶129. Mr. Ozols, like Mr. Mukans, was a low-level participant in the scheme without managerial responsibility and no applicable supervisory enhancement. Indeed, Mr. Ozols' circumstances merit a more substantial variance than was

---

[13] At the time of sentencing, Mr. Mors was 22 years old (*See* Exh. S at Tr. 14:14-19 (Sentencing Hearing Transcript, *United States v. Emils Mors*, 16 Cr. 692 (JMF) (Aug. 8, 2017)), and Mr. Beresnevics and Mr. Klava were also in their 20s. *See* Exh. R at Tr. 10:3-6. Mr. Mukans was 44 years old at the time of sentencing. *Id.* at Tr. 9:21-22.

granted to Mr. Mukans, given his motive for the offense, relationship with his children, and the other factors cited above, which were not present in Mr. Mukans' case.  We note further that at sentencing, the government described Mr. Mukans as a "seasoned participant" in the conspiracy, and indicated that he had moved from New York to Miami in order to carry on the fraud and "evade law enforcement."  *See* Exh. R at Tr. 7:11-17.  Mr. Ozols did not move cities, and his bank withdrawals all took place within a five-month period.

Finally, we note that the three other defendants, all of whom have been sentenced in this case to periods of imprisonment within the applicable Guidelines range, are readily distinguishable from Mr. Ozols.  None had mitigating circumstances akin to those presented by Mr. Ozols, as described above.  Moreover, the government characterized defendant Janis Klava, who received a sentence of 66 months' imprisonment, as a manager who was "at the higher end of the conspirators within the United States."  *See* Exh. T at Gov. 3 (Government Sentencing Submission, *United States v. Janis Klava*, 16 Cr. 692 (JMF) (Jan. 23, 2018)).  Kristaps Beresnevics, who also was sentenced to a term of 66 months' imprisonment, played a "quite significant" supervisory role in the scheme and purchased credit card numbers on the dark web to further the conspiracy.  *See* Exh. U at Tr. 12:2-8 (Sentencing Hearing Transcript, *United States v. Kristaps Beresnevics*, 16 Cr. 692 (JMF) (Jan. 9, 2018)).  And Emils Mors, who was sentenced to 57 months' imprisonment – at the bottom of the applicable Guidelines range – was a "mid-level manager" and Klava's "deputy," who jumped bail and re-joined the conspiracy following his initial arrest.  *See* Exh. V at Gov. 4 (Government Sentencing Submission, *United States v. Emils Mors*, 16 Cr. 692 (JMF) (July 14, 2017)).

**CONCLUSION**

For the foregoing reasons, we respectfully submit that the Court should sentence

Mr. Ozols to less than 36 months' imprisonment.

Dated: New York, New York
      January 22, 2019

                        Respectfully submitted,

                      By     /s/ _____
                               Darren A. LaVerne
                               Nolan J. Robinson
                               Samuel B. Shepson

                               KRAMER LEVIN NAFTALIS &
                               FRANKEL LLP
                               1177 Avenue of the Americas
                               New York, NY  10036
                               Telephone:  212.715.9100

                               *Counsel for Ivars Ozols*

cc:  AUSA Matthew Hellman (By ECF)
     U.S. Probation Officer Johnny Kim (By ECF)