**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 29, 2019

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    *United States* v. *Ivars Ozols*, S11 16 Cr. 692 (JMF)

Dear Judge Furman:

     The defendant in this case, Ivars Ozols ("Ozols" or "the defendant"), is scheduled to be sentenced on February 5, 2019, having pled guilty to conspiracy to commit bank fraud and wire fraud. The Government respectfully submits this letter in advance of the sentencing. In a plea agreement between the parties, the Government and the defendant stipulated to a United States Sentencing Guidelines ("Guidelines") range of 41 to 51 months' imprisonment. For the reasons set forth below, the Government submits that a sentence within that stipulated Guidelines range is warranted in this case.

## A. Offense Conduct

     As the Court is aware, this case involves a wire fraud and money laundering conspiracy by a network of individuals located in the United States and overseas. The conspiracy has targeted victims principally through variations on an internet fraud: a member of the conspiracy posts an advertisement for a car, boat, tractor, kitchen appliance, or other singular, expensive, and fungible property for sale on the internet. *See* U.S. Probation Office's Final Presentence Report, dated January 11, 2019 ("PSR"), ¶¶ 14. These advertisements are typically posted on well-known website involving either auctions or direct sales, such as eBay or Craigslist. *Id.* Though posted on sites where unaffiliated sellers can attempt transactions, the conspiracy often fraudulently utilizes the names, logos, and business pedigree of legitimate businesses to give the veneer of credibility to the ads, and take advantage of positive reviews attributed to the true businesses. *Id.*

     After a prospective victim makes an inquiry in response to an advertisement, the members of the conspiracy controlling the fake ads negotiate with the buyers, typically via e-mail. *Id.* ¶ 15. Again, the e-mail addresses mimic or duplicate those of the legitimate businesses. *Id.* The conspirators and victims come to an agreement, at which point, the conspirators provide wiring instructions to the victims. *Id.* Maintaining the illusion of legitimacy, conspirators suggest an arms-length transaction by directing victims to third-party bank accounts, which are either

corporate or business accounts. *Id.* Those accounts are opened at the banks in the names of shell corporations established for the purpose of furthering the fraud. *Id.* Once recruited by the conspiracy, members responsible for the bank accounts are named as the principles of the shell corporations, and in turn open accounts at multiple banks to await transfer of victim funds as directed by the co-conspirators controlling the online advertisements. *Id.* ¶¶ 14, 15.

Victims then wire funds into the shell corporation bank accounts, believing they are transmitting funds in order to, for example, purchase a vehicle and pay for its transportation. *Id.* ¶ 15, 16. Next, conspirators who have established the accounts are alerted to the money transfers by other members of the scheme. The same or next day of the transfer, members of the scheme controlling the accounts head to the banks and begin withdrawing funds. *Id.* ¶ 16. The withdrawals are made in cash, from both ATMs and the tellers at bank counters. *Id.* Where practicable, the withdrawals are under $10,000, to avoid reporting requirements and evade scrutiny by bank and law enforcement officials. *Id.*

During this short period, victims are unaware that their funds are being drained, and the overriding goal of the conspirators is to take all the money before the funds can be frozen and otherwise stopped. To accomplish this, conspirators will withdraw funds from numerous bank branches in rapid succession, frequently on the same day. *Id.* ¶¶ 19, 24, 29. After funds are withdrawn, money is then distributed amongst the conspiracy in various ways, including via wiring or physical transportation, principally from within the United States back to Europe. *Id.* ¶ 16. Victims do not ever receive the items they believed they were purchasing, and are generally unable to recoup their funds once the money has been withdrawn from the accounts. *Id.*

Ozols was a member of the conspiracy who traveled to the United States, opened bank accounts, and withdrew victim funds. *Id.* ¶¶ 17-38. Ozols entered the United States in or about June 2017 on a tourist visa at Miami International Airport. *Id.* ¶ 79. He lived in Florida, in Fort Lauderdale and Delray Beach, through the time of his arrest in April 2018. *Id.* ¶¶ 79, 80. At around the same time of his arrival in the United States, corporations named "Wally Ozo Corp." and "Seaside Blue, Inc." were incorporated via the internet with the Florida Department of State in Ozols's name and using Ozols personal information. *Id.* ¶ 17. Once in the United States, Ozols used the Wally Ozo Corp. to personally open business or corporate bank accounts at three banks. *Id.* ¶¶ 18, 22, 33. Ozols also opened a bank account using the Seaside Blue, Inc. corporate identity. *Id.* ¶ 27. Victim funds were wired to these accounts throughout June and July of 2017. *Id.* ¶¶ 19 – 34. Ozols personally entered bank branches and withdrew victim funds from the Wally Ozo, Corp. and Seaside Blue, Inc. accounts.

Ozols monitored these accounts and withdrew funds when they became available to him, often the same or next days from their transmittal. For example, on or about July 11, 2017, July 12, 2017, and July 14, 2017, multiple victims wired funds into the Seaside Blue, Inc. account controlled by Ozols. *Id.* 28. Before the end of the day on July 14, 2017, Ozols had successfully withdrawn the entirety of those funds in cash, totaling $80,900, leaving the account with a balance of -$50. *Id.* ¶¶ 28, 29. As depicted in part below, Ozols withdrew those funds from teller counter withdrawals from at least seven different bank branches where he could access the Seaside Blue, Inc. accounts.



Digital Video Snapshot
Site: JPMorgan Chase/FL/Oakland Park/FL Commercial & Dixie 5055 N Dixie Hwy
Camera Name: 3.2 Teller #2
7/12/2017 10:40:38 AM (Eastern Daylight Time)



Digital Video Snapshot
Site: JPMorgan Chase/FL/Plantation/FL Plantation 200 S Pine Island Rd, Ste 100
Camera Name: 1.2 Teller #2
7/14/2017 3:11:12 PM (Eastern Daylight Time)

The individuals who had wired money into the Seaside Blue, Inc. accounts became aware of the fraud days after the accounts were already empty. Each described a similar sequence of events, which mirrored the general fraud outlined above. For example, one victim had negotiated for a 1949 pickup truck advertised on Craigslist. *Id.* ¶ 30. The victim agreed to terms with the seller including price and transportation costs, and signed and returned a contract sent by the seller – who was a conspirator. *Id.* The victim never received a truck, and filed a complaint on July 15, 2017 – a day after his funds had already disappeared, withdrawn by the defendant. *Id.*

This pattern of activity was continued by the defendant, which conduct he has admitted. The defendant acknowledged that he traveled to the United States and, once here, established accounts using fraudulent information. *Id.* ¶ 52. After receiving funds, the defendant transferred them to co-conspirators in Latvia, among others. *Id.* The defendant claimed that he kept 10% of the money he withdrew from these accounts as payment. *Id.* Ozols remained in Florida until his arrest, where he lived with others involved in the conspiracy, including Madars Jankevics, also charged in this case.

**B. The Plea and Guidelines Calculation**

On April 18, 2018, Ozols was arrested in Delray Beach, Florida. *Id.* ¶ 44. He arrived in the Southern District on May 16, 2018. On October 22, 2018, pursuant to a plea agreement, Ozols pleaded guilty to conspiracy to commit bank and wire fraud, as charged in the Indictment. *Id.* ¶ 5. In the plea agreement, the parties stipulated to a Sentencing Guidelines offense level of 22 and a criminal history category of I, resulting in a Guidelines range of 41 to 51 months' imprisonment. *Id.* ¶ 5. The U.S. Probation Department, calculating a greater offense level of 24 and the same criminal history category, reaches a Guidelines range of 51 to 63 months' imprisonment. *Id.* ¶¶ 53, 69, 113. As noted throughout the Government's submission herein, the Government seeks a

sentence within the Guidelines range of 41 to 51 months as stipulated in the plea agreement. In a sentencing submission dated January 22, 2019, the defendant, through counsel, requests that the Court impose a sentence to less than 36 months' imprisonment.

### C. Discussion

#### 1. Applicable Law

As the court is aware, the Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### 2. A Guidelines Sentence Is Reasonable in This Case

The Government respectfully submits that a sentence within the Guidelines range to which the parties stipulated of 41 to 51 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Weighing the applicable factors under 18 U.S.C. § 3553(a)(2), it is clear that the seriousness of the offense, and the need to promote respect for the law, provide just punishment, afford adequate deterrence and protect the public, are all significant considerations in crafting a just sentence given the conduct at issue in this case. A sentence within the Guidelines range of 41 to 51 months acknowledges the most pernicious effects of the

defendant's conduct and its impact on individual victims, promotes due respect for the laws designed to protect the financial security of both persons and institutions in the United States, will serve to dissuade similarly situated conspirators and make more difficult the task of those implementing the scheme overall, protects the public at large, and most importantly will justly punish the defendant's behavior within this far-reaching and damaging conspiracy.

*First*, a significant prison sentence is necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, and to provide just punishment. The conspiracy outlined herein resulted in millions of dollars in losses to consumers. As this Court is aware and has previously acknowledged while sentencing co-conspirators, the victims of the conspiracy have by and large been everyday Americans. As reflected in victim impact statements, many victims devoted considerable savings and emotional investment to their intended purchases – frequently classic cars.[1] Typically, these were not hyper-luxury items available only to those with a maximum quotient of disposable income, but collector vehicles pursued by those who sought to recall the dreams and freedoms of their youth, or recall a bygone era. They sought cars or boats that connoted a sense of history, status, and sentiment: a 1949 Chevy Truck, a Ford Bronco, an Airstream trailer. Many of the victims have reported saving funds and waiting for the right opportunity, and nearly all describe their surprise at being taken by a complex scam. The conspirators went to impressive lengths; far from a random, mass e-mail conceit that would take a substantial share of unsophisticated victims, the conspirators posted ads using real business identities, took pains to provide photographs, VIN numbers, registration information, insurance history, and detailed records about the cars in an effort to prove their authenticity and *bona fides* as dealers.

The defendant's role in the case was therefore critical. By impersonating shell corporations and opening corporate banking accounts, the defendant played a crucial part in convincing even careful victims to part with tens of thousands of dollars. Believing they were sending their money to business – with all the legitimacy and protection that sense conveyed – the victims did not suspect their money was vanishing without any real possibility of recourse. The conspiracy therefore requires something more of participants like the defendant than that of a prototypical mule or courier. The defendant was required to take on a corporate identity, propagate that elemental falsehood across multiple financial institutions, and then act as the fact of the conspiracy by entering the banks and withdrawing large sums through direct interactions with bank employees, explaining the funds had come from people, individuals whose names and intended purchases he needed to know should the bank employee ask.

The Government does not contend that the defendant was personally posting the ads or acting as the principal contact with the victims, but his role implicated fundamental and repeated misrepresentations to the banks and direct contact with the victim funds, some of which he kept, and some of which he passed along to leave the United States to go to conspirators. Thus, the defendant was required by his role to be aware of new victims, their identities and intended purchases, and the times that they had opened themselves up to the fraud; it was the defendant's

---

[1] Victim impact statements have been submitted to the Court and counsel under separate cover.

job to make sure the banks gave out that money as quickly as possible.[2]  Simply put, the fraud cannot be completed without front-line participants like the defendant.

*Second*, a sentence within the stipulated Guidelines range is significant, and is necessary to afford adequate deterrence to both the defendant as well as others similarly situated.  First, some the defendant's claims about his own involvement are unpersuasive.  The defendant notes at length that a series of financial and personal highs and lows provide the background to his initial participation in the conspiracy.  The defendant outlines legitimate professional ventures in Europe that rose and fell with the global economy, and notes that he borrowed money from individuals as well as banks.  Claiming to have been threatened and once assaulted by those to whom he owed money, these creditors then proposed Ozols join the fraud.  Though the defendant claims he unknowingly joined the criminal conspiracy under a form of duress, he acknowledges that he willingly participated after realizing it was a criminal venture.  Moreover, the defendant continued his participation after making money sufficient to repay his personal debt and end any obligation to those who had threatened him.

Even notwithstanding funds the defendant wired to various individuals in Europe, including individuals now separately indicted in the instant case, in excess of $70,000, the defendant has acknowledged he retained at least 10% of the funds he withdrew – which figure on its own would have enabled him to settle the balance of that personal debt.  The defendant additionally cites his significant family ties to Europe.  But the defendant did not join the conspiracy, come to the United States, participate as an ascetic, and then return after settling his debt.  Instead, the defendant continued to engage in the fraud scheme with the same people, apparently, who had threatened his parents and assaulted him, and did so willingly after his debt was repaid.  Furthermore, the defendant remained far from his family in southern Florida, and made plans to expand his family here, becoming engaged to a woman he met while at a bar here in the United States during his involvement in the conspiracy.  Finally, the defendant's age is an important factor for the Court to consider, but the Government respectfully notes that the defendant did not begin his conduct as a young man, but as a person with world experience, a family, and a history of starting multiple businesses.  He was not misled by youthful indiscretion.  Whatever the initial impetus for the defendant's involvement in the conspiracy, he willingly engaged and continued his involvement well after those factors ceased to play a meaningful role.

The court may also consider the important of deterrence to similarly situated individuals, and to the fraud scheme overall.  The defendant's claims of coercion at the outset of his own involvement notwithstanding, the scheme – as noted earlier – depends on individuals who can travel to the United States to participate in the conspiracy, and then leave, with minimal consequence but for apprehension.  A substantial penalty to those the conspiracy recruits to operate at the forefront of the scheme will dissuade others from participating, hindering the scheme's architects, and lowering risk to potential future victims and institutions.

---

[2] The defendant's broad criticism of the fraud Guidelines and its calculation of loss is misplaced because of their clear connection to individual victims in the instant case.  Where loss is guided by the quantifiable harm to actual, identifiable victims, it is neither "arbitrary" nor poses only a "modest relationship to the level of culpability of a particular defendant" as in the case counsel cites in support of its argument.  *See* Def. Sent. Sub. at 14.

*Finally*, a sentence within the Guidelines range stipulated by the parties will serve to justly punish the defendant with respect to personal conduct and his relative culpability.  First, the defendant notes a sentence imposed by Judge Abrams in this District in *United States v. Obracanik*, 17 Cr. 144 (RA) *See* Def. Sent. Sub. at 15.  This case is inapposite.  There, the defendant, who was a bank employee and the sole participant in a fraud, stole $4.7 million dollars by causing money to be wired from an account at a bank to one he controlled.  The case is easily distinguishable from Mr. Ozols's, most obviously by the nature of the victims here: unlike the bank as victim, they were nearly all individual persons who were tricked by a wide conspiracy into wiring money in a way that left them without means to get that money back.  With respect to others in the case, the defendants conduct is perhaps most comparable to that of Madars Jankevics, who is awaiting sentence, but is not unlike the core conduct of other co-conspirators who traveled to the United States to merit the substantial deviation from the defendant's stipulated guidelines range counsel suggests.  The lack of a role adjustment under Chapter 3, for example, should not automatically result in a variance below guidelines.

The stipulated range fairly accounts for the length of the defendant's participation in the fraudulent activity, proximity to others in the conspiracy (such as Jankevics), his use of multiple accounts through which victim funds passed, and the seriousness of the impact on the victims of the conspiracy.  To reflect Ozols's relative culpability, a Guidelines sentence between 41 and 51 months is appropriate.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

by: _____
Matthew Hellman / Daniel Nessim /
Emily Johnson
Assistant United States Attorneys
(212) 637-2278 / -2486 / -2409