J2c1ozos

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          16 Cr. 692 (JMF)

 5   IVARS OZOLS,

 6              Defendant.                  Sentencing

 7   ------------------------------x

 8                                          New York, N.Y.
                                            February 12, 2019
 9                                          3:57 p.m.

10
     Before:
11
                       HON. JESSE M. FURMAN,
12
                                            District Judge
13

14                         APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  MATTHEW J.C. HELLMAN
17        EMILY JOHNSON
          DANIEL G. NESSIM
18        Assistant United States Attorneys

19   KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys for Defendant
20   BY:  DARREN LaVERNE, ESQ.
          SAMUEL B. SHEPSON, ESQ.
21
     ALSO PRESENT:  CHRISTINA FOX, Special Agent, FBI
22

23   ALSO PRESENT:  NELLY ALISHAEV, Interpreter (Russian)

24

25
```

J2c1ozos

```
1              (Case called)
2              THE DEPUTY CLERK:  Counsel, please state your
3    appearance for the record.
4              MR. HELLMAN:  Good afternoon.  Matthew Hellman, Emily
5    Johnson, and Daniel Nessim for the government.  With us at
6    counsel table is Special Agent Christina Fox from the FBI.
7              THE COURT:  Good afternoon.  A common force.
8              MR. LaVERNE:  Good afternoon, your Honor.  Darren
9    LaVerne for Mr. Ozols, and I have one colleague with me,
10   Mr. Shepson of our office.  Thank you.
11             THE COURT:  All right.  Good afternoon to you as well.
12             We do have a Russian language interpreter here today.
13   My understanding is that Mr. Ozols does understand and speak
14   English, is that correct?
15             MR. LaVERNE:  He speaks it.  I've dealt with him now
16   obviously for some period of time, and I would say he's
17   developed a better speaking understanding of English but
18   sometimes needs the interpreter's assistance.
19             THE COURT:  All right.  Mr. Ozols, would you like to
20   communicate in English and then just turn to the interpreter if
21   you need assistance, or would you prefer to use the
22   interpreter?  What's your preference?
23             THE DEFENDANT:  (Through interpreter) Whenever it's
24   necessary.
25             THE COURT:  All right.  Very good.  So if at any point
```

J2c1ozos

1    you have any trouble understanding or want to use the

2    interpreter's services, just let me know and we will certainly

3    allow that.  All right?

4              THE DEFENDANT:  (In English) Yes, sir.

5              THE COURT:  All right.  If you could move the

6    microphone a little closer to you, please, that would be

7    helpful.

8              All right.  We are here for purposes of sentencing.

9    In preparation for today's proceeding, I have reviewed the

10   presentence report dated January 11, 2019.  I've also received

11   and reviewed the following additional submissions:

12             The defendant's submission dated January 22, 2019, and

13   the attachments to that submission, including various letters,

14   letters from the defendant, his fiancée, his fiancée's sister,

15   his parents, his son, some friends and acquaintances, as well

16   as various other documents, including documents from other

17   defendants or relating to other defendants in this case and

18   other cases, an MDC work performance rating, and so on.

19             I've also received and reviewed the government's

20   submission dated January 29, 2019.

21             On top of that, I've received and reviewed various

22   victim impact statements.  Some of those are documented at

23   Docket Nos. 82 and 94, and more recently I received letters, I

24   think forwarded by the government, one under cover letter dated

25   February 11, 2019, and the other didn't have a cover letter but

J2c1ozos

1   I think was a 55-page document that was transmitted at some

2   point in the last few days.

3          Mr. LaVerne, have you received a copy of those

4   submissions?

5          MR. LaVERNE:  I have, your Honor, and I had a comment

6   just as to one of them, if your Honor please.

7          One of the letters that came in this morning I think

8   erroneously suggested that Mr. Ozols was the individual who had

9   interacted with the victim across the internet and sort of the

10   front-facing part of the scam.  My guess is that the victim was

11   just told that a Mr. Ozols was being sentenced today and

12   assumed that was the person that he'd interacted with.  I don't

13   think Mr. Hellman would dispute my characterization and the

14   fact that there is no evidence here that Mr. Ozols himself had

15   interacted with this particular victim.

16          THE COURT:  And you said a letter that came this

17   morning.  Is it that you received it this morning?

18          MR. LaVERNE:  I believe I received it either last

19   night or this morning over the internet.  I'm not sure when it

20   was provided to the Court.

21          THE COURT:  All right.  So this is the last letter in

22   the smaller packet that says, "I had the unfortunate

23   circumstances of crossing paths with the accused"?

24          MR. LaVERNE:  That's correct.

25          THE COURT:  Okay.  Understood.

J2c1ozos

1           Mr. Hellman, any dispute on that score?

2           MR. HELLMAN:  No.

3           THE COURT:  And any reason that these letters can't be

4    docketed with any identifying information regarding the victims

5    redacted?

6           MR. HELLMAN:  No.  And the government has endeavored

7    to provide redacted copies, which I believe comport with the

8    individual rules of the Court.

9           THE COURT:  All right.  If you could docket them on

10   ECF just so they're part of the public record, and to the

11   extent that there are other sentencings coming up and these are

12   not really specific to any one defendant, I think it would be

13   helpful if they were on the docket.  All right?

14          MR. HELLMAN:  Yes.  Thank you.

15          THE COURT:  And also, just for recordkeeping purposes,

16   I would say going forward, if you have additional letters that

17   you plan to submit, it is helpful to have them under a cover

18   letter, just so I can reference that by date, as opposed to

19   this batch that didn't have a cover letter associated.

20          MR. HELLMAN:  My copy does.  It may not have come

21   through in the transmission, but we'll make sure the docketed

22   version has a cover letter.

23          THE COURT:  All right.  Well, what is the date of your

24   cover letter?

25          MR. HELLMAN:  January 25, 2019.

J2c1ozos

| 1 | THE COURT:  Gotcha.  Well, that's a mystery. |
| 2 | All right.  So each of you has received the other's |
| 3 | submissions and the submissions that I just referenced, is that |
| 4 | correct? |
| 5 | MR. LaVERNE:  That's correct, your Honor. |
| 6 | MR. HELLMAN:  Yes. |
| 7 | THE COURT:  And are there any other submissions that I |
| 8 | should have received? |
| 9 | MR. LaVERNE:  None from the defense. |
| 10 | MR. HELLMAN:  And none from the government. |
| 11 | THE COURT:  All right.  Very good. |
| 12 | And before I proceed, let me just confirm -- I assume |
| 13 | the answer is yes, given these victim impact statements, but -- |
| 14 | has the government notified any crime victims of their rights |
| 15 | with respect to today's proceedings? |
| 16 | MR. HELLMAN:  We have, both directly and through the |
| 17 | automated notification system in the office, many victims. |
| 18 | THE COURT:  All right.  Very good. |
| 19 | Mr. LaVerne, have you read the presentence report? |
| 20 | MR. LaVERNE:  I have, your Honor. |
| 21 | THE COURT:  And have you discussed it with Mr. Ozols? |
| 22 | MR. LaVERNE:  Yes. |
| 23 | THE COURT:  Putting aside the guidelines for a moment, |
| 24 | any objections with respect to the factual accuracy of the |
| 25 | report? |

J2c1ozos

<table>
<tr><td>1</td><td>MR. LaVERNE:  The only objections we had were</td></tr>
<tr><td>2</td><td>contained in the objections that we sent to probation.</td></tr>
<tr><td>3</td><td>THE COURT:  All right.  And have those been addressed</td></tr>
<tr><td>4</td><td>in the final disclosure?</td></tr>
<tr><td>5</td><td>MR. LaVERNE:  They were not all accepted, but they</td></tr>
<tr><td>6</td><td>were all addressed in one way or the other.</td></tr>
<tr><td>7</td><td>THE COURT:  Okay.  Mr. Ozols, have you read the</td></tr>
<tr><td>8</td><td>presentence report?</td></tr>
<tr><td>9</td><td>THE DEFENDANT:  (In English) Yes.</td></tr>
<tr><td>10</td><td>THE COURT:  And were you able to understand it in</td></tr>
<tr><td>11</td><td>English?</td></tr>
<tr><td>12</td><td>THE DEFENDANT:  (In English) It was --</td></tr>
<tr><td>13</td><td>THE COURT:  Just move the microphone, please.  Just</td></tr>
<tr><td>14</td><td>bring it right close, like an inch or two away.</td></tr>
<tr><td>15</td><td>THE DEFENDANT:  (In English) Yes, I read and I had</td></tr>
<tr><td>16</td><td>translated, and something I don't understand, she will</td></tr>
<tr><td>17</td><td>translate for me.</td></tr>
<tr><td>18</td><td>THE COURT:  So you utilized the services of a</td></tr>
<tr><td>19</td><td>translator?</td></tr>
<tr><td>20</td><td>MR. LaVERNE:  Your Honor, we had a translator on hand.</td></tr>
<tr><td>21</td><td>Similar sort of thing; where necessary, the translator helped</td></tr>
<tr><td>22</td><td>us.</td></tr>
<tr><td>23</td><td>THE COURT:  All right.  And did you discuss it with</td></tr>
<tr><td>24</td><td>Mr. LaVerne, with counsel?</td></tr>
<tr><td>25</td><td>THE DEFENDANT:  (In English) Yes.</td></tr>
</table>

J2clozos

1          THE COURT:  And did you have enough time to go over

2     the report with your lawyers and discuss anything that you

3     would want to bring to my attention in connection with your

4     sentencing?

5          THE DEFENDANT:  (In English) Yes.

6          THE COURT:  All right.  Mr. Hellman, did you review

7     the presentence report?

8          MR. HELLMAN:  Yes.

9          THE COURT:  And putting aside the guidelines, any

10    objection to the factual accuracy of the report?

11          MR. HELLMAN:  No.

12          THE COURT:  Hearing no objections, I will adopt the

13    factual recitations set forth in the presentence report, which

14    will be made part of the record and kept under seal in this

15    matter.  If an appeal is taken, counsel on appeal may have

16    access to the sealed report without further application to me.

17          Turning then to the Sentencing Guidelines, as counsel

18    know, I'm not bound by the guidelines, but I do have to

19    consider the applicable guidelines range in determining an

20    appropriate sentence and must therefore begin by accurately

21    calculating the guidelines range.

22          In this case there was a plea agreement in which the

23    parties agreed to a stipulated guidelines range, but my

24    understanding is that probation has calculated a slightly

25    higher range by virtue of coming up with a higher loss figure.

J2clozos

1    Is that correct?

2              MR. LaVERNE:  That's correct.  I'd much rather they

3    calculated it slightly higher, but it's higher.

4              THE COURT:  All right.  Now I certainly understand

5    that both sides adhered to the plea agreement or have asked me

6    to sentence the defendant within the stipulated guidelines

7    range, but my task is, in the first instance, to determine what

8    the actual guidelines range is.  I take it from your letters

9    that I sort of sense that no one is actually disputing

10   probation's calculation based on the information known to the

11   parties as of today, is that correct?

12             MR. LaVERNE:  That's correct, your Honor.  We realize

13   the Court can use your discretion in terms of applying the

14   number.

15             THE COURT:  All right.  Mr. Hellman?

16             MR. HELLMAN:  That's right.

17             THE COURT:  All right.  So based on the parties'

18   agreement, the absence of any objection, and my independent

19   evaluation of the guidelines, I accept the guidelines

20   calculation that's set forth in the presentence report.  That

21   is, using the November 2018 edition of the guidelines, I find

22   that the total offense level is 24, criminal history category

23   is I, and the guidelines range is 51 to 63 months'

24   imprisonment, with a fine range of $20,000 to $1 million.

25             In the plea agreement both parties agreed not to seek

J2c1ozos

1   a departure from the admittedly different guidelines range.  Is

2   that correct?

3            MR. LaVERNE:  That's correct, your Honor.

4            MR. HELLMAN:  Yes.

5            THE COURT:  I've nevertheless considered whether there

6   is any appropriate basis for a departure from the range that I

7   just articulated and do not find that there are any such

8   grounds.  Obviously departures are different from what has come

9   to be known as a variance.

10            With that, let me turn first to counsel, and then if

11   Mr. Ozols wishes to say anything, I'll hear from him.

12            I have read your sentencing submissions so you don't

13   need to repeat what you've already stated there, and obviously

14   this isn't my first sentencing in this matter, as both sides

15   clearly know.

16            So with that, let me hear first from Mr. Hellman.

17            MR. HELLMAN:  Thank you.  And not to recapitulate what

18   is already in the government's sentencing submission, I'll

19   point out, in light of what was just discussed, it is still the

20   government's position that a sentence within the guidelines

21   range to which the parties stipulated is appropriate in this

22   case.  It's 41 to 51 months, which is a significant and

23   important sentence to reflect the enormous harm that this

24   conspiracy, and in particular this defendant's conduct within

25   the conspiracy, has occasioned upon many victims in the case.

J2clozos

1              As the Court could see in the government's sentencing

2       submission, a particular victim deposited funds on July 11th

3       and 12th of 2017, and in the days that followed, Mr. Ozols

4       personally entered bank branches in Florida and withdrew that

5       victim's funds.  A letter from that victim's, that late

6       victim's domestic partner, life partner, was submitted in the

7       sequence of victim impact statements, evincing the incredible

8       damage that the theft of thousands of dollars from vulnerable

9       victims can occasion.  The financial harm to the victims is

10      mentioned in all of the victim impact statements, but almost

11      all of them also mention the emotional toll that these thefts

12      took on them, the personal toll it took on their relationships,

13      the feelings of foolishness and helplessness that came

14      afterwards.

15              For this conspiracy to succeed, it requires actors

16      like the defendant to come to the United States, represent that

17      they are something they are not, and enter the banks again and

18      again, taking funds from those victims.

19              The amount of the loss is important here, because each

20      dollar represents a direct attributable loss to a victim who

21      believed they were purchasing something.  These victims include

22      people at all ranges of sophistication.  Some of them are older

23      members of society who are chasing an old dream or thrill with

24      a classic car, some are car dealers themselves who have been

25      engaged in online sales for as long as online auto sales have

J2c1ozos

1    existed.  They're not unsophisticated victims.  They get

2    documentation and paperwork from members of the conspiracy,

3    which, as previously mentioned, are not occupying the same role

4    as the defendant.  But the victims really believe that they

5    have brokered a deal in good faith and that they're not fools

6    parting with their money, who feel very differently at the end

7    of the experience.  And it is the government's position that

8    significant sentences with respect to defendants like Mr. Ozols

9    are one of the only ways that the victims can obtain any

10   measure of relief from the embarrassment, financial harm, and

11   in some cases total ruin to which they've come in the aftermath

12   of what are to them very significant financial crimes.

13        And second, one of the most powerful, if not only

14   ways, that this conspiracy can be addressed for every victim

15   and really for every actor in the conspiracy, who is subject to

16   a significant sentence, it becomes that much more difficult for

17   the conspiracy to achieve its aims in convincing people to come

18   to the United States and engage in the conduct in the first

19   place.

20        If there are any particular questions from the

21   Court --

22        THE COURT:  I do have a few.  Thank you for that.

23        First is, I'd like you to just respond to two

24   representations or things mentioned in the defense submission.

25        Number one, counsel represents that Mr. Ozols

J2c1ozos

1    immediately confessed upon his arrest to the FBI, and I'm

2    curious to know if that is accurate.

3         Second, he represents that in essence, he began his

4    involvement in the crimes -- I use the term not in the legal

5    sense but in the colloquial sense -- under coercion, that he

6    had made a loan to others involved in the conspiracy and in

7    essence was paying off that loan and sort of, you know,

8    threatened and coerced to involve himself.  I think he doesn't

9    deny that he continued his involvement even after that was paid

10   off and beyond the reach of those individuals, but do you have

11   any information one way or another regarding that?

12        So those two questions.

13        MR. HELLMAN:  To the first, the defendant did make a

14   statement to law enforcement after he was apprehended.  I think

15   that that -- it was a confession.  There were many admissions

16   during that statement.  I don't know that the statement

17   represents the absolute totality of the defendant's involvement

18   in the conspiracy.  But it's fair to say that he did not

19   immediately deny his role in the offense when questioned by the

20   FBI.  He, understanding *Miranda*, waived it, provided a

21   statement, and the government does acknowledge that.

22        To the second question, the government sought to

23   address this in its submission somewhat.

24        THE COURT:  I inferred that you -- well, you were

25   equivocal with respect to the representation.  You responded to

J2c1ozos

1  it but didn't embrace the representation; let's put it that

2  way.

3          MR. HELLMAN:  It's a difficult question to answer

4  because in a way it's almost an impossible assertion for the

5  government to cleanly rebut.  In a sense the statement -- or

6  the suggestion seeks to have it both ways.  The defendant was

7  under some form of duress or coercion, suffering threats, and

8  his family was also suffering threats at the time that he joins

9  the conspiracy, but he also fully embraces responsibility by

10 admitting that he remained in the conspiracy well after that

11 threat had passed.

12          One of the interesting aspects, from the government's

13 point of view, about the source of the loan or the duration of

14 the loan is it was about almost ten years, apparently interest

15 free, and of a different quality than the loans which were

16 professional business loans.  They appear on their face, to the

17 government's reckoning, and based on its knowledge of

18 co-defendants who are from similar communities -- including,

19 for example, the weightlifting community in Latvia in

20 particular, people that the defendant would have known through

21 that community -- frankly, we have no way of knowing whether

22 any such threats were actually made or were not made.  But I

23 think the important thing from our point of view is that based

24 on what the investigation revealed about wire transfers going

25 back to Latvia, about the amount of time the defendant spent in

J2c1ozos

1   the conspiracy, about the defendant's own admissions about the

2   amount of money that he obtained from his involvement in the

3   conspiracy, any such debt was paid well before the defendant

4   withdrew from the conspiracy, and it would appear, therefore,

5   that certainly for a significant portion of the duration of the

6   defendant's involvement in the conspiracy here, he was a

7   willing, active, engaged participant in the conspiracy, without

8   any threat to his family or himself back in Latvia.

9        Apparently while here, the defendant met a woman and

10  became engaged, and was enjoying the period of time that he was

11  living in Florida.  I can't argue with the idea that the

12  defendant wishes to get back to his family overseas, but if it

13  is true that he was brought here initially with his family

14  under threat and with his own personal safety under threat,

15  when that harm or risk of danger abated, one would have

16  expected that the defendant would have withdrawn from the

17  conspiracy and headed for home.  He appears to have done the

18  opposite.

19        THE COURT:  All right.  And in terms of comparators,

20  defense seeks to compare Mr. Ozols to Mr. Mukans, and I

21  understand you've compared him to Mr. Jankevics, but of course

22  I haven't sentenced that defendant yet.  With respect to the

23  defendants that I have sentenced, how would you compare

24  Mr. Ozols on the dimension of culpability?  If I remember

25  correctly, Mr. Mukans' loss amount was not as high as it is for

J2c1ozos

Mr. Ozols.

MR. HELLMAN:  Correct.  I'm sorry.  I don't have the
number offhand.  I think of the defendants who have been
sentenced so far, it is probably closer to that of Mukans.
When we, in the coming weeks, head to the sentencing of
Mr. Jankevics, I would compare him to Mr. Ozols, because it
appears from the investigation, from the duration of time they
were in the United States and from their conduct, that they
were very similarly situated -- that is, as, in the
government's estimation, prolific members of the conspiracy
heading into the banks in order to withdraw victim funds over a
sustained period of time.

THE COURT:  All right.  And three more questions.

First:  Restitution and forfeiture.  On restitution,
are you seeking the amount referenced in the presentence
report?

MR. HELLMAN:  Mr. LaVerne and I had an opportunity to
discuss that before court today.  I note that the Court has
provided about 90 days in the past.  I think something much
less than that would be the government's ask for an opportunity
to come to an agreement with counsel and submit a proposed
restitution order for the Court.  It will be I think along the
lines of what is contained within the presentence report.

THE COURT:  And forfeiture, there's a preliminary
order of forfeiture in the amount of I think $234,522.  Is that

J2c1ozos

1    the amount that you are asking for today?

2              MR. HELLMAN:  In forfeiture, yes.

3              THE COURT:  All right.  And then last but not least, I

4    think my order had indicated that counsel should be prepared to

5    update me on the state of play at the MDC and also address what

6    effect, if any, that should have on sentencing.  What's your

7    thought on the latter, and anything you can tell me on the

8    former?

9              MR. HELLMAN:  So the government's best information

10   with respect to the recent power outage and other challenges at

11   the MDC is that they are at this point resolved.  The power is

12   back on, and it is back to business as usual at the MDC.  I

13   know that during that period visits with counsel were

14   curtailed.  I'm not in a position right now -- and I'm sure

15   Mr. LaVerne can help -- to know where Mr. Ozols was in the

16   facility and whether any of the difficulties there, beyond the

17   visitation, were actually transmitted to Mr. Ozols.  That being

18   said, I don't think that the one week or so of the experience

19   of the inmates at the MDC should color the sentence, which is

20   to address the defendant's conduct, which is well before that

21   happened.  I understand that it may be a compelling factor to

22   Mr. Ozols, but that is a period of time at the MDC prior to the

23   sentence and was totally out of the control of the Court or the

24   government.  A fire at the MDC was in effect, as the government

25   currently understands it, akin to an act of god, and there is

J2c1ozos

1  currently an investigation from a number of different angles

2  ongoing to determine what could have been done to forestall or

3  ameliorate the situation in a more productive way, but I don't

4  know that it should affect the Court's decision in rendering a

5  sentence here today.

6          THE COURT:  All right.  I think that might have

7  painted it a little more rosy than reality was, but that's

8  fine.  Thank you.

9          Mr. LaVerne, let me hear from you.

10         MR. LaVERNE:  Thank you, your Honor.  And if I may,

11 I'll address the MDC point first, just so I don't forget to do

12 that.

13         We've obviously spoken to Mr. Ozols about his own

14 experience, which was harrowing that week at the MDC and I

15 think consistent with the experiences that your Honor has

16 probably heard about, whether through the hearing that Judge

17 Torres conducted last week or other avenues.  Mr. Ozols --

18 after the power went down on that Sunday, the following day

19 Mr. Ozols was locked into his cell, and up until Thursday, the

20 inmates were only let out very briefly for meals but were

21 otherwise locked in their cell the entire time.  There was no

22 power, there was no lighting within their cells, and perhaps

23 most disturbingly, the heat was off.  Mr. Ozols told us that

24 the temperature, he estimates -- obviously he didn't have a

25 thermometer, but he estimates the temperature in his cell was

J2c1ozos

from 35 to 40 degrees during this period of time.  No blankets

were handed out until the courts got involved and attention was

paid to this the following week.  The Thursday of that week,

things got worse.  Mr. Ozols, who's on the seventh floor --

which I note is one of the floors that Judge Torres visited

after a hearing last week -- Mr. Ozols, at least his unit was

locked down completely from Thursday evening to the following

Sunday.  They were not let out at all.  They were sitting in

darkness.  They were freezing.  Mr. Ozols, I can tell you, he's

not a complainer by nature.  And just hearing him though relate

what was happening and what was happening and the experience of

others around him who needed medical care and such was very

disturbing.  For Mr. Hellman to say -- I don't think he really

meant this -- to say that it was sort of out of their control

and an act of god and something that was not in the

government's control -- when I say government, I mean BOP's

control -- I think is absurd.  I think that will be borne out

in not this proceeding but in other proceedings that are

addressed to this specific issue, including the civil suit

that's been filed in the Eastern District.  I guess what I

would say for today is, I do think, and I would ask, that the

Court give some consideration to the fact that there was excess

and extreme punishment visited upon Mr. Ozols during that week.

And actually, to be honest, your Honor, I believe, if you heard

the testimony in front of Judge Torres last week, there were

J2c1ozos

1   troubles with the heat in the weeks prior as well.  So I'd ask,

2   your Honor, that you incorporate that in some fashion in your

3   thinking about the duration of the sentence to be imposed here.

4            That's all I'll say about the MDC, unless your Honor

5   has questions.

6            THE COURT:  No.  That's good.  Thank you.

7            MR. LaVERNE:  A few points in response to Mr. Hellman.

8   I'm not going to rehash what's in my memorandum, obviously.

9            I don't blame him for focusing on the harm to the

10  victims.  The victim impact statements were very powerful, and

11  no one is disputing here what this fraud caused and the damage

12  that it did to others.  I do think, your Honor, that, as your

13  Honor knows, that is only one part of the equation.  There are

14  other things to consider here.

15           I take the point that, you know, without people like

16  Mr. Ozols, the fraud could not have been perpetrated.  He did

17  move money, take it out of accounts and send it overseas.  I

18  think you can make the same argument about a drug courier or

19  any lower-level participant in a criminal scheme, and the

20  question is really not simply could the fraud have been

21  perpetrated without him but what role did he play as compared

22  to others in the scheme.  And just following the docket, I see

23  that the government has now arrested folks in Latvia who I

24  imagine were further up in the hierarchy of the scheme and will

25  be here before your Honor and you'll have an opportunity to

J2clozos

1    compare the relative culpability here, as your Honor has tried

2    to do I think with respect to the defendants that have come

3    before you already.

4           Look, what's crucial here, and I think what we tried

5    to highlight in our memorandum for Mr. Ozols and to distinguish

6    Mr. Ozols from the other folks who have come before you, are

7    the other parts of the sentencing equation, including his

8    personal history and characteristics and the context for his

9    involvement in this particular crime.  I hear your Honor's

10   questions sort of probing how the government's -- what their

11   reaction is to our assertions in the memorandum.  Look, one of

12   the things I've found -- I'm relatively recent to the CJA

13   panel, this is my first time I represented someone who is here

14   as an immigrant and was really only here for ten months -- is

15   that it's much harder, and there's a lot of challenges in terms

16   of corroborating things they tell you and understanding their

17   life, because you don't have the friends and family at hand and

18   all the records at your disposal as you might with a defendant

19   who is here.  Everything is overseas, and it's harder to get.

20   We did our best.  We spoke -- we were lucky in that Mr. Ozols,

21   as we said, has a very close relationship with his 18-year-old

22   son, who was in touch with us, who was helpful in talking to

23   us, giving us his perspective on his father's life, helping us

24   try to find further corroboration of that from other family

25   members, and we did.  I mean, we put in letters from his

J2c1ozos

1   parents, who corroborated not simply the fact that he did have

2   these loans hanging over his head but that they themselves had

3   mortgaged their apartment and were having trouble now, are

4   having trouble, making those payments as a result of his

5   business going bust.  His parents further corroborated in their

6   letter that there were these threatening individuals who had

7   come around their apartment back in Latvia asking for

8   Mr. Ozols.  So we've offered that corroboration.

9          I guess the other point, your Honor, which I would

10  make is, it's the only explanation or it is the explanation in

11  this context that explains and makes sense of Mr. Ozols's life

12  and his involvement in this offense.  I mean, he had 20 years

13  of work history, working in a variety of different

14  professions -- butcher, production operator at a manufacturing

15  plant for seven years, a trucker, he started his own business.

16  This is someone who does not look for a quick buck, an easy

17  buck.  He's not a fraudster.  And it makes sense, I submit,

18  your Honor, that it's only under the circumstances that he

19  found himself in -- that is, severely under debt -- that he

20  agreed to enter into this offense.

21          I take Mr. Hellman's point.  I'm not arguing that he

22  came over here and lived, as I think he put it, an aesthetic

23  life.  He wasn't a monk.  He didn't save every dollar and put

24  it towards the loan that he owed.  Some of the money he sent

25  back to his son, to help his son pay rent and other life

J2c1ozos

1   expenses.  He sent other money back to his parents.  He spent

2   some money for himself.  But also, the function, the real

3   purpose of him being here and being involved in the offense was

4   to pay down this loan, which he did to a certain extent over

5   time.

6           Your Honor had asked about his confession.  I have it

7   here.  I'm happy to hand it up.  It's a, you know,

8   three-and-a-half-page, single-spaced document.  He was

9   interviewed extensively the morning of his arrest.  Yes, he

10  didn't give every single detail of the conspiracy.  I don't

11  think the circumstances lent themselves to that.  He did

12  confess to the essence of what it was, explained what it was,

13  how it worked, his involvement.  He mentioned the individuals

14  over in Latvia.  And I submit, your Honor, that it's evidence

15  of the fact that this is not an inveterate criminal; it's

16  someone who was caught, understood immediately that this was

17  wrong, and wanted to make amends and do what he could to make

18  things right.  So that's with regard to that.

19          With regard to situating Mr. Ozols with respect to the

20  other defendants in this case, those who have been sentenced,

21  we included a significant section about this in our memorandum

22  because I would imagine it's at the top of mind for your Honor.

23  Look, our view is that Mukans is the most similarly situated

24  insofar as he was a lower-level participant, he wasn't a more

25  supervisory type of participant like the other individuals who

1   have been sentenced.  His loss amount, I believe -- and we

2   cited it in our papers -- was 250,000 to 550,000, and his

3   guidelines were 41 to 51 months.  So he essentially was in the

4   range that the parties have stipulated to as part of the

5   agreement.  I recognize that further information came out after

6   additional investigation.  But I don't think, as a matter of

7   scope of involvement and loss, he is that much differently

8   situated from Mr. Ozols.  We pointed out that as a matter of

9   the withdrawals that Mr. Ozols made, we counted the numbers and

10  he's just over the threshold of $550,000 threshold, and would

11  otherwise be in Mr. Mukans' category.

12          I do think there are differences for Mr. Mukans' case.

13  Foremost among them, absent from his case were all of these

14  mitigating circumstances that we've been through and

15  corroborated; absent from his case was the many years of work

16  history that Mr. Ozols has had and the evidence that he is not

17  someone you have to worry about recidivating, that this was

18  essentially an aberration in his life.  And Mr. Ozols, like

19  Mr. Mukans, is in his 40s, unlike the other defendants you've

20  sentenced, all in their 20s.  I think that has factored into

21  your Honor's sentences.

22          That's essentially what I have to say.  I'm certainly

23  open to any questions your Honor has.  I think I've addressed

24  everything that Mr. Hellman raised, but if there are other

25  issues that you think merit addressing, please do let me know.

J2c1ozos

1          THE COURT:  I guess just as a housekeeping matter,

2    with regard to restitution and forfeiture, I assume on

3    forfeiture, no objection to entering an order of forfeiture

4    consistent with the preliminary order?

5          MR. LaVERNE:  That's correct.

6          THE COURT:  And on restitution, sounds like you're

7    discussing it.

8          MR. LaVERNE:  That's right, your Honor.

9          THE COURT:  All right.  Very good.

10          Mr. Ozols, is there anything that you would like to

11    say before I sentence you?

12          MR. LaVERNE:  Mr. Ozols very much wanted to say some

13    words in English to your Honor, so he's written something out.

14    I ask for the Court's indulgence.  He's not fluent, obviously,

15    so it may take him a bit of time, but he would like to read it.

16          THE COURT:  Sure.  Two requests:

17          One, just if you could read it slowly and loudly into

18    the microphone, that would be very helpful.

19          Two, Mr. LaVerne, the court reporter may appreciate

20    getting a written copy, if you can provide that after the fact,

21    just to ensure that the record is accurate.

22          But with that, Mr. Ozols?

23          THE DEFENDANT:  (In English) Your Honor, thank you for

24    taking the time to listen to me.  I wanted to apologize to the

25    Court, and the US attorney, for taking their time related to my

J2c1ozos

1    stupid mistake.  I will be forever embarrassed for my actions.

2    And I know that it will follow me the rest of my life.  I want

3    to take -- say thank you to US attorney for working with me and

4    my attorney to resolve my legal problem.

5              I know that I have wonderful fiancée at home and two

6    beautiful kids that I have a lot to make up for to them.  It

7    will take a long time to regain their trust.  I will be working

8    on that for rest -- for many years for what I have done to them

9    for -- in my absence.

10             I know that what I did is really wrong; it's very

11   wrong.  I hope my actions, immediately discussing with

12   arresting officers, show that.  I know that it will not make up

13   for what I did with victims for all of this crime.  But I hope

14   it's -- I hope it is a beginning.

15             When your Honor determines that I have served my

16   punishment in US, United States, I have a long road ahead of me

17   back in my country Latvia.  I am looking forward to the

18   challenge.  I have a lot to give back to my community in the

19   future -- in the future through my physical fitness gifts.  I

20   cannot wait -- I cannot wait to share them with kids in the

21   future and explain that my "shortcut" solution to my problem is

22   never the right way to fix something.

23             Thank you for your time.  I promise that you will

24   never have to deal with me or my mistakes again.  Thank you.

25             THE COURT:  Thank you, Mr. Ozols.

J2c1ozos

1          I take it there are no victims present in court today,

2    is that correct?

3          MR. HELLMAN:  Correct.

4          THE COURT:  All right.  And is there any reason why

5    sentence should not be imposed at this time?

6          MR. HELLMAN:  No.

7          MR. LaVERNE:  No, your Honor.

8          THE COURT:  In imposing sentence, I am required to

9    consider the factors set forth in Title 18 United States Code

10   Section 3553(a).  Those include:

11         First, the nature and circumstances of the offense and

12   the history and characteristics of the defendant;

13         Second, the need for the sentence imposed to advance

14   the purposes of sentencing -- namely, to reflect the

15   seriousness of the offense, to promote respect for the law, and

16   to provide just punishment for the offense, to afford adequate

17   deterrence to criminal conduct, to protect the public from

18   further crimes of the defendant, and to provide the defendant

19   with needed educational or vocational training, medical care,

20   or other correctional treatment in the most effective manner;

21         Third, the kinds of sentences available;

22         Fourth, the guidelines range, which I have found to be

23   51 to 63 months' imprisonment;

24         Fifth, any pertinent policy statement;

25         Sixth, the need to avoid unwarranted sentencing

J2c1ozos

disparities among defendants with similar records who have been
found guilty of similar conduct;

Seventh, the need to provide restitution to any
victims of the offense.

Ultimately I am required to impose a sentence that is
sufficient but no greater than necessary to serve the purposes
of sentencing that I mentioned a moment ago.

This is not my first word on the crime to which
Mr. Ozols has pleaded guilty, since I've sentenced a number of
other defendants in this case, and for that reason, I'm not
writing on a blank slate, or speaking on a blank slate.  As
I've said before, I do think the crime here is a significant,
serious one, and for that reason calls for a substantial
punishment.  It's a serious offense.  There are real victims.
I think the letters that I received in the last few days really
bring that to life, perhaps in a way that the earlier victim
impact statements didn't even do.  The one that Mr. Hellman
referred to from the wife of one of the victims who committed
suicide after the fraud here was particularly poignant.
Obviously that may or may not have been attributable to the
fraud and, regardless, wasn't directly attributable to
Mr. Ozols, but it does underscore the pain caused by the
victimization of these people, many of whom, it appears from
these letters, were particularly vulnerable and lost
substantial amounts of money, if not their entire life savings.

1          In addition, like some of the other defendants,

2     Mr. Ozols came here and overstayed his visa, came here for the

3     purpose of committing a crime, which itself is a serious and

4     significant thing.

5          I think the most recent letters from victims also

6     really underscore and make clear just how sophisticated the

7     scheme was.  For all of the time I've spent in connection with

8     this case before, I'm not sure I fully realized quite how

9     sophisticated it was in terms of the ways in which the

10    defendants posed as legitimate dealers, used others' identities

11    and the like in an effort to trick and steal money from

12    victims, all of which I think does underscore and call for a

13    substantial sentence, largely for the purposes of deterrence.

14    I think folks like Mr. Ozols are instrumental to this scheme,

15    and while he wasn't the mastermind behind it, it wouldn't be

16    successful, it wouldn't be doable without people like him

17    willing to be the feet on the ground, if you will, getting the

18    money and sending it back to Latvia or Lithuania.

19         Having said that, I don't necessarily think that

20    warrants a guidelines sentence.  One word on that.  I do think

21    that the relevant guidelines range is the correct one.  I

22    recognize that the parties stipulated to a lower range, but my

23    general view on that is that it would be a windfall to a

24    defendant to give him the benefit of the lower range,

25    particularly since presumably the defendant knows better than

J2c1ozos

1    the government the full range of his conduct at the time of an

2    agreement and in that regard probably takes his chances that

3    the government may find out more information.  Moreover, at the

4    time of the plea, I did advise Mr. Ozols, as I do in every

5    plea, that in the event that I determine the guidelines range

6    is higher, that that would have no bearing on his plea and in

7    that sense he's bound by the guidelines range as it's correctly

8    determined.

9         Be that as it may, I do think that a nonguidelines

10   sentence is appropriate.  I am moved by Mr. Ozols's obvious

11   remorse and contrition.  The fact that he did immediately

12   confess to the FBI, in broad strokes, if not in fine detail, is

13   significant and corroborates that.

14        This is his first offense.  It seems clear to me that

15   there's not a great need for specific deterrence or a need to

16   protect the public from further crimes of Mr. Ozols.  When push

17   comes to shove, I think the need for general deterrence is the

18   overriding reason for a substantial sentence, but it doesn't

19   necessarily call for a sentence within the guidelines range.

20        Finally, I do believe and will give Mr. Ozols some

21   credit for what he endured at the MDC in the last few weeks.

22   This is not the forum in which to litigate the full scope of

23   what happened and whose fault it is.  I certainly don't fault

24   the U.S. Attorney's Office, but to the extent that Mr. Hellman

25   referred to the government writ large, it is clearly the

J2c1ozos

1    government's fault, and even if there was a fire, it's pretty

2    clear to me, based on what I have heard and read, that steps

3    could have been taken, and taken more quickly, to address the

4    problems, even if the problems initially arose for reasons

5    unrelated to anyone's fault.  And the bottom line is, the

6    conditions that I read about are the conditions that one

7    associates with a third world country and not a country like

8    this, and nobody in detention, whether convicted, not

9    convicted, awaiting sentencing, should have to endure that as

10    the detainees did at the MDC.  Again, this is not the forum on

11    which to fully litigate these matters.  I recognize a lawsuit

12    has been filed in the Eastern District, and I presume that that

13    will proceed.  But I do think that some acknowledgment of these

14    recent events is appropriate here.

15         So for all of those reasons, I do think a

16    nonguidelines sentence is appropriate.

17         I would add to that the sentence that I imposed on

18    Mr. Mukans.  Sounds like there is agreement that as to the

19    defendants I have sentenced, that he is the most comparably

20    seated, if you will.  The loss amount and guidelines range here

21    are higher, and for that reason there is an argument for a

22    slightly higher range, but I also recognize that there are some

23    mitigating circumstances here that were not present in

24    Mr. Mukans' case.

25         So with those preliminary remarks aside, I will now

J2c1ozos

1    state the sentence that I intend to impose.

2           And Mr. Ozols, I would ask you to please rise.

3           Mr. Ozols, it is the judgment of this Court that you

4    are remanded to the custody of the Bureau of Prisons for a

5    period of 39 months -- that is, three years and three months --

6    to be followed by a period of three years of supervised

7    release.

8           Supervised release is likely to be academic insofar as

9    I expect you'll be removed from this country and returned to

10   Latvia, if not somewhere else, but during your term of

11   supervised release, you will be subject to the following

12   mandatory conditions:

13          You shall not commit another federal, state, or local

14   crime;

15          You shall not illegally possess a controlled

16   substance;

17          You shall refrain from any unlawful use of a

18   controlled substance and submit to one drug test within 15 days

19   of your release and at least two periodic drug tests

20   thereafter, as determined by probation;

21          You shall cooperate in the collection of DNA as

22   directed by probation;

23          And you shall satisfy your financial obligations that

24   I will discuss shortly, including complying with any

25   installment payment schedule that I impose.

J2clozos

1          In addition, the standard conditions of supervised

2     release which are set forth in the presentence report and will

3     be set forth in the judgment shall apply.  Among other things,

4     you shall not possess a firearm or destructive device; and you

5     shall report to the probation office in the judicial district

6     where you are authorized to reside within 72 hours of your

7     release from custody.

8          Finally, you must also meet the following special

9     conditions:

10          You shall obey the immigration laws and comply with

11     the directives of immigration authorities.

12          You shall submit your person, residence, place of

13     business, vehicle, or any property or electronic device under

14     your control to a search on the basis that the probation

15     officer has a reasonable belief that contraband or evidence of

16     a violation of the conditions of release may be found.  The

17     search must be conducted at a reasonable time and in a

18     reasonable manner.  Failure to submit to a search may be

19     grounds for revocation.  You shall inform any other residents

20     that the premises may be subject to search pursuant to that

21     condition.

22          You shall provide the probation officer with access to

23     any requested financial information, unless you have satisfied

24     your financial obligations.

25          You shall not incur any new credit charges or open

34

J2c1ozos

1    additional lines of credit without the approval of the

2    probation officer unless you have satisfied your financial

3    obligations.

4            And you shall be supervised in the district of your

5    residence.

6            I'm not going to impose a fine because I find that you

7    would not have the ability to pay a fine and it would interfere

8    with your restitution payments.

9            I will impose restitution in an amount to be

10   determined within the next 90 days.  Counsel should confer in

11   an effort to agree upon a proposed restitution order and submit

12   it to me.  You will make restitution in accordance with

13   Title 18 United States Code Section 3663(a), payable to the

14   clerk of the United States District Court for disbursement to

15   the victims that will be set forth on the order to be entered.

16   That obligation shall be joint and several with your

17   co-defendants.  I will waive the requirement of interest under

18   Section 3664(f) in light of your financial circumstances.

19           If you are engaged in a BOP nonUNICOR work program,

20   you shall pay $25 per quarter towards the criminal financial

21   penalties.  However, if you participate in the UNICOR program

22   as a Grade 1 through 4, you shall pay 50 percent of your

23   monthly UNICOR earnings toward the criminal financial penalties

24   consistent with BOP regulations.  Any payment made that is not

25   payment in full shall be divided proportionally among the

J2c1ozos

victims named.  Restitution shall thereafter be paid in monthly

installments of 15 percent of your gross monthly income over

the period of supervision to commence 30 days after your

release from custody.  And if there's any material change in

your economic circumstances that might affect your ability to

pay restitution, you shall notify the Court and the probation

department.

I also impose the mandatory special assessment of

$100, which shall be due and payable immediately.

And in accordance with the preliminary order of

forfeiture, I order you to forfeit to the United States

$234,522, which represents the proceeds that you obtained

directly or indirectly as a result of your criminal activity.

That obligation shall be joint and several with the obligations

of your co-defendants.

Does either counsel know of any legal reason why the

sentence should not be imposed as stated?

MR. HELLMAN:  No.

MR. LaVERNE:  No, your Honor.

THE COURT:  Sentence as stated is imposed.  I find

that the sentence is sufficient but no greater than necessary

to satisfy the sentencing purposes set forth in Section

3553(a)(2), including the need to promote respect for the law,

to promote just punishment for the offense, to afford adequate

deterrence to the defendant, and, as I said, more importantly,

J2c1ozos

```
1    to others, and to protect the public from further crimes of the

2    defendant.

3            Mr. LaVerne, any requests with respect to a

4    designation location?

5            MR. LaVERNE:  Yes.  Thank you, your Honor.  Two

6    requests, actually.

7            One is, I'd ask respectfully, your Honor, that you

8    recommend that Mr. Ozols be designated to a facility in

9    Florida, or near Florida.  His fiancée, Ms. Shaw, spends time

10   there.  It would be easier for her to visit.

11           The second request, I wonder whether your Honor would

12   consider making a recommendation that Mr. Ozols serve his time

13   in a BOP facility as opposed to a privately contracted

14   facility.  As I understand it, many immigrants under a final

15   order of removal and are facing deportation are sent to these

16   facilities these days.  They have no programming; the

17   conditions there are apparently horrible.  I make that request

18   particularly in light of what Mr. Ozols has been through at the

19   MDC.

20           THE COURT:  All right.  Well, I confess that's a first

21   for me.  I haven't received that sort of request before and I'm

22   not aware that there is a distinction between the two.  But I

23   have no problem making the recommendation, recognizing, of

24   course, that it's ultimately up to BOP.  So I will make that

25   recommendation, and I will certainly recommend that he be
```

J2c1ozos

1    designated to a facility in Florida.  Florida is rather large.

2    Is there a particular area in Florida?

3              (Mr. LaVerne conferring with the defendant)

4              MR. LaVERNE:  Closer to Miami.

5              THE COURT:  All right.  I'll recommend that he be

6    designated to a facility as close to Miami as possible to

7    facilitate the maintenance of ties to his fiancée.

8              Mr. Ozols, I hope that what you told me earlier today

9    and what you wrote in the letter that you submitted to me --

10   and for that I thank you -- I hope that I can take you at your

11   word that you will put this matter behind you.  No person is

12   defined by any one thing that they do, and you are certainly

13   not defined by what you did that led you to be here.  And I

14   hope you can put it behind you and move on with your life once

15   you have served your sentence.  You obviously are a man with

16   some talent, as reflected in your athletic performance, and I

17   hope that you are able to use that skill or any other talents

18   that you may have to live a law-abiding life in Latvia and put

19   your days of crime behind you and that you do live up to the

20   remorse that you have expressed today.

21             Mr. Hellman, are there any open counts that need to be

22   dismissed?

23             MR. HELLMAN:  Yes.  Count Two, and I move to dismiss

24   Count Two at this time.

25             THE COURT:  It is so dismissed.

J2c1ozos

1          Mr. Ozols, to the extent that you have not given up

2     your right to appeal through your guilty plea and the plea

3     agreement that you entered into in connection with your plea,

4     you do have the right to appeal.  Any notice of appeal must be

5     filed within 14 days of entry of the judgment.  If you cannot

6     afford to pay the cost of an appeal, you may apply for leave to

7     appeal *in forma pauperis*.

8          Anything else?

9          MR. LaVERNE:  No.  Thank you, your Honor.

10          MR. HELLMAN:  Not from the government.

11          THE COURT:  All right.  One note, and then I'll

12     adjourn.

13          Mr. Hellman, or counsel at the front table, to the

14     extent that we have other sentencings coming up, I would say if

15     you can engage in the meet-and-confer process with respect to

16     restitution in advance of it, just to avoid the need to stretch

17     things out beyond the sentencing proceeding, it might be

18     helpful.  Obviously if there is reason to keep it open, that's

19     one thing, but if you can resolve it before sentencing, that

20     would be advantageous.

21          MR. HELLMAN:  Yes.

22          THE COURT:  All right.  Thank you.

23          Mr. Ozols, I wish you the best of luck.  And we are

24     adjourned.  Thank you.

25          THE DEPUTY CLERK:  All rise.